**UNITED STATES of America,**

v.

**Matthew CURTIS, and David
T. Melvin, Defendants.**

**No. CRIM.02–0127 PLF.**

United States District Court,
District of Columbia.

Dec. 3, 2002.

Emory Cole, Assist. U.S. Atty., Washington, DC, for U.S.

Stephen Brennwald, Brennwald & Robertson, Washington, DC, Paul D. Hunt, Rockville, MD, for defendants.

## MEMORANDUM OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

This matter came on for a motions hearing on the motions of defendants Matthew Curtis and David Melvin to suppress physical evidence and the motion of defendant Matthew Curtis to suppress statements. For a variety of reasons, the hearing was extended over several days and many months: May 31, October 10, and November 13, 2002.

At the conclusion of the hearing on November 13, 2002, the Court announced its findings of fact, crediting the testimony of Metropolitan Police Officer Nathaniel Peterson and Deputy United States Marshal Vincent O'Neal and—to the extent it was inconsistent with their testimony—discrediting the testimony of defendant Matthew Curtis. Defendant David Melvin did not testify. Based upon the facts found and the reasons announced in open court, the Court concluded that: (1) the law enforcement officers had a valid arrest warrant for defendant Melvin's arrest for escape, a photograph of defendant Melvin and reliable information that he could be found in Apartment 207, 625–B Chesapeake Street, S.E., in the District of Columbia; (2) the officers announced their identity and purpose when they arrived at the apartment, and defendant Curtis gave his consent to their entry into the apartment; (3) defendant Melvin was properly arrested in the living room near a couch pursuant to the arrest warrant and handcuffed; (4) defendant Curtis was properly patted down, Officer Peterson felt an object during the pat-down which

(based upon his experience) he believed to be a bag of marijuana, and defendant Curtis then reached into his own pocket at the request of the officer and removed the marijuana; (5) defendant Curtis handed the marijuana to Officer Peterson who placed it on the pool table in the living room; and (6) defendant Curtis was then lawfully placed under arrest in the living room for possession of marijuana and handcuffed. It follows from these findings of fact and conclusions of law that, contrary to defense counsel's argument, any statements made by defendant Curtis up to this point were not the fruit of a poisonous tree, since there was no poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The reasons for all of these findings and conclusions are more fully explicated in the Court's oral ruling of November 13, 2002, and this Memorandum Opinion must be read in conjunction with the transcript of that proceeding.

■ The question on which the Court reserved ruling is the legitimacy of the protective sweep of the apartment that ensued and the admissibility of the evidence observed during the protective sweep and subsequently seized. In this connection, the Court again credits the testimony of the officers as to the steps they next took and the reasons for taking those steps: After defendants Curtis and Melvin had been placed under arrest in the living room and handcuffed, both defendants and all four law enforcement officers were in the "front center of the living room ... right in the living room area by the pool table." Testimony of Officer Nathaniel Peterson, Transcript of May 31, 2002 ("Peterson May 31 Test.") at 18, 20. Two of the officers remained with the defendants while the other two officers— Officer Peterson and Deputy Marshal

O'Neal—then "conducted a security sweep of the premises ... to make sure there wasn't any other person in it that could harm myself or fellow officers." *Id.* at 21; *see* Testimony of Officer Nathaniel Peterson, Transcript of October 10, 2002 ("Peterson Oct. 10 Test.") at 29–30, 32. The security sweep of the apartment took about ten minutes, and the officers saw narcotics and guns in plain view during the sweep. Peterson May 31 Test. at 40–41. The officers had not seen any drugs or guns except for the marijuana in Mr. Curtis' pocket before they swept the apartment. Peterson Oct. 10 Test. at 23. During the course of the protective sweep, the officers came upon a locked closet in the back bedroom (Bedroom No. 2) and therefore returned to the living room and asked defendant Curtis (handcuffed and sitting on the floor along with defendant Melvin) where to find the key to the closet; he told them it was hanging on the wall in Bedroom No. 2. Peterson Oct. 10 Test. at 47–52. The officers returned to Bedroom No. 2 and unlocked the closet. After obtaining a search warrant, the officers seized 24 items they had seen in plain view during the protective sweep and an additional 11 items pursuant to the search warrant. Peterson May 31 Test. at 44–45.

The government justifies the officers' protective sweep of the entire apartment under the authority of the Supreme Court's decision in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). According to the government, the officers were justified in entering the bedroom slightly down the hall and closer to the living room (Bedroom No. 1), the bedroom at the very end of the hallway at the back of the apartment (Bedroom No. 2), and the locked closet in Bedroom No. 2. It maintains that all of the evidence observed in plain view in those two bedrooms and that closet should be admitted in evidence because there was no Fourth Amendment

violation. Defendants disagree. All counsel acknowledged, however, that the resolution of this question turns on a close reading of the Supreme Court's decision in *Maryland v. Buie* and two decisions of the United States Court of Appeals for this Circuit: *United States v. Ford*, 56 F.3d 265 (D.C.Cir.1995), and *In re Sealed Case 96–3167*, 153 F.3d 759 (D.C.Cir.1998). The Court agreed to reread those cases carefully before ruling.

A "protective sweep" is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. at 327, 110 S.Ct. 1093. The Supreme Court in *Buie* recognized that once the person sought pursuant to an arrest warrant has been found and arrested, the search for him is over and there is no longer that justification for entering other rooms to conduct a search; there is an expectation of privacy in the remaining areas of the house. *Id.* at 333, 110 S.Ct. 1093. On the other hand, the Court noted that the risk of danger in the context of an arrest in a home or apartment is probably larger than it would be in an on-the-street investigatory encounter because the officer is at greater risk of an ambush in a confined setting on his adversary's turf. *Id.* Accordingly, the Supreme Court recognized the legitimacy of a protective sweep without a warrant in two separate situations with two separate standards.

First, the Court held that an arresting officer could, incident to the arrest and "as a precautionary matter and without probable cause or reasonable suspicion," look in closets and other spaces "immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. at 334, 110 S.Ct. 1093. If the sweep goes beyond such an immediately adjoining space, however, the Court held that there must be "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Thus, the first type of sweep requires no probable cause or reasonable suspicion, while the second requires at least the same level of reasonable suspicion as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Maryland v. Buie*, 494 U.S. at 334, 110 S.Ct. 1093. In either case, the protective sweep, aimed at protecting the arresting officers, is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093. It follows, of course, that officers engaged in a legitimate protective sweep need not close their eyes to what they see in plain view and that such objects may be admitted in evidence without violating the Fourth Amendment. *See United States v. Ford*, 56 F.3d at 266, 270.

In this case, and in view of the testimony presented, the government has explicitly stated that it is relying only on the first prong of *Buie*, not the second. The officers had no "reasonable belief based on specific and articulable facts that the areas searched harbored a dangerous individual, which would justify *Buie*'s second type of sweep." *United States v. Ford*, 56 F.3d at 269. Thus, the officers in this case were free only "to look in spaces immediately adjoining the place of [Curtis' arrest or Melvin's arrest] from which an attack could be immediately launched." *Mary-*

*land v. Buie*, 494 U.S. at 334, 110 S.Ct. 1093; *see also United States v. Ford*, 56 F.3d at 270 (the first prong of *Buie* permits only a "very circumscribed" sweep). Because the arrests of Curtis and Melvin both took place in the living room and both defendants were handcuffed and made to sit on the floor in the living room, the officers could legitimately look in other spaces in the living room, in the open kitchen, and in the living room closet near the couch on which Melvin was sitting just prior to his arrest. Once their mission was accomplished and the two defendants had been incapacitated, however, there was no longer any urgency to the situation and the officers could go no further without reasonable suspicion.

As Government Exhibit No. 1 (a diagram of the premises) shows, the living room was very large, covering at least one-third of the square footage of the apartment. It was large enough to house a pool table. Immediately adjacent to it was an open kitchen, but the bedrooms were down a hallway. Unlike the living room closet or the kitchen, neither Bedroom No. 1 nor Bedroom No. 2 was a "closet or other space immediately adjoining the place of arrest" (the living room), nor a place "from which an attack could be immediately launched." Before they began the sweep, the officers had "complete[d] the arrests" and handcuffed the defendants and could simply have "depart[ed] the premises." *Maryland v. Buie*, 494 U.S. at 336, 110 S.Ct. 1093; *see United States v. Ford*, 56 F.3d at 269 (once defendants were in custody, they "no longer posed a threat to the police"). There was no justification for a sweep of such "remote areas" as the bedrooms and the locked closet under the first prong of *Buie. See In re Sealed Case, 96–3167*, 153 F.3d at 769 (sweep of remote areas, not immediately adjoining place of arrest, must be based on articulable facts under the second prong). Unless the first prong of the *Buie* protective sweep doctrine means that a small apartment may always be swept in its entirety without probable cause or reasonable suspicion that someone else might be in the apartment who could pose a danger, the sweep in this case must be limited to the living room, its closet and the open kitchen.[1]

For the reasons stated herein and in open Court on November 13, 2002, it is hereby

ORDERED that defendants' motions to suppress physical evidence and statements are GRANTED in part and DENIED in part; it is

FURTHER ORDERED that all the physical evidence seized except the marijuana seized from defendant Curtis' person (Item No. 1), and all statements made by defendant Curtis except those made before he was arrested are SUPPRESSED; and it is

FURTHER ORDERED that on or before December 9, 2002, counsel for the government shall advise the undersigned, Judge Bryant (to whom this case has been transferred for trial), and counsel for the defendants whether the government plans to proceed to trial on December 11, 2002, or move for a continuance for the purpose of considering whether to appeal this Court's ruling, or to move to dismiss the case.

SO ORDERED.

---

1. In view of this ruling, the government's alternative inevitable discovery argument must be rejected. Nothing would have been inevitably discovered in this case.